## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALONZO EUGENE TURNER-BEY #205-291*
    Plaintiff,

                                   *

    v.                           CIVIL ACTION NO. JFM-10-2816

                                   *

GARY D. MAYNARD, et al.,
    Defendants.                 *

### MEMORANDUM

    Alonzo Eugene Turner-Bey, a self-represented prisoner confined within the Maryland Division of Correction ("DOC"), filed a civil rights action pursuant to 42 U.S.C. § 1983, complaining that prison policy forces him to choose between violating Islamic dietary law or remaining on a strict vegetarian diet. He further claims the vegetarian diet offered may contain items unacceptable to him as a practicing Muslim.[1]

    In addition to these claims alleging violations of the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[2] plaintiff alleges civil rights violations premised on a violation of the First Amendment's Establishment Clause and denial of his right to equal protection. In support of his claims, he points to a DOC directive which accommodates the specific religious dietary needs of Jewish prisoners while excluding Muslims from same.[3] Plaintiff requests compensatory and punitive

---

[1] Plaintiff has been a member of the Moorish Science Temple of America, an Islamic religious group, since 1990. ECF No. 26, Affidavit of Alonzo E. Turner-Bey. ¶ 1. He seeks religious dietary accommodation for himself. As a self-represented litigant, he is not entitled to act on behalf of a class. *See Inmates v. Owens*, 561 F.2d 560, 562 (4th Cir. 1977); *see also Oxendine v. Williams*, 509 F.2d 1405, 1406 (4th Cir. 1975).

[2] As relevant here, RLUIPA prohibits a state or federal government from placing any substantial burden on religious exercise by persons residing in, or confined to, an institution, except to further compelling governmental interest. It does not elevate accommodation of religious observances over institutional needs to maintain order and safety. *See* Religious Land Use and Institutionalized Persons Act of 2000, § 3, 42 U.S.C. A. §2000cc-1.

[3] The issue regarding provision of a religious diet to plaintiff is deemed exhausted under the Prison Litigation Reform Act ["PLRA"] as it has been examined by a Maryland Administrative Law Judge ("ALJ"). The hearing, convened without notification to dietary or religious services personnel, resulted in a decision favoring plaintiff.

damages and an injunction requiring the DOC to provide him with a diet fully acceptable under Islamic law which, among other things, will include ritually slaughtered meat.

Defendants[4] respond that plaintiff's claims are premised on mistakes of fact. They explain that for the past two decades DOC has provided a vegetarian or lacto-ovo menu that meets Islamic religious requirements. Defendants also contend that the DOC does not provide Jewish prisoners meat slaughtered in accordance with Jewish dietary laws, and aver that the state is unable to afford a diet option for any religious group that includes ritually-slaughtered animals due to cost and practical limitations on prison storage, cooking and serving capacities.

An initial dispositive motion filed by six of the named defendants was denied subject to additional briefing.[5] The initial dispositive motions and opposition materials[6] are again examined, together with the court-ordered supplemental and opposition memoranda.[7] A hearing is not necessary for resolution of the case.[8] *See* Local Rule 105.6. (D. Md. 2011).

---

ECF No. 22, Exhibit A, Declaration of Richard West, ¶ 3. The administrative decision was rendered without testimony from key DOC religious and dietary personnel, who were unaware of the hearing. Thus, while the decision is relevant to the chronology of this action, it is not relied upon here.

[4] Defendants include Kathleen Green (Warden of Eastern Correctional Institution or "ECI"), Debbie Heffron (ECI's Correctional Dietary Manager), Fazel Khattack (ECI's Islamic chaplain), Gary Maynard (Secretary of the Maryland Department of Public Safety and Correctional Services or "DPSCS"), Connie Shaff (DOC Corectional Dietary Regional Manager for the Eastern Region) and J. Michael Stouffer (DOC Commissioner). Defendant Nancy Williams, who served as Director of Religious Services for the Maryland Division of Correction from March of 1981 until her retirement in May of 2009 (ECF No. 47, Exhibit B, ¶ 1), has been served and is now a party in this action. Plaintiff was transferred from ECI to Jessup Correctional Institution ("JCI") in 2009. Plaintiff was transferred from JCI to the Maryland Correctional Institution at Hagerstown ("MCI-H") in the summer of 2011. ECF No. 25.

[5] *See* ECF Nos. 27-28.

[6] *See* ECF Nos. 22 and 26.

[7] *See* ECF Nos. 47, 52-54. Plaintiff's previously-filed motions to amend the complaint to add two DOC employees (ECF Nos. 13 and 29) were inadvertently overlooked. The employees, Lt. Thornton and Sgt. Anita L. Ballard, made statements to plaintiff indicating his requests for a religious diet would not be granted because he was a Muslim and thus entitled to the vegetarian diet. ECF Nos. 13 and 29. For reasons apparent herein, these defendants are not needed for resolution of this case and if served would be entitled to summary judgment. Plaintiff's requests to amend the complaint are therefore denied.

[8] Accordingly, plaintiff's requests for appointment of counsel (ECF Nos. 42 and 55) are denied. Seldom does this

**Standard of Review**

Motion for Summary Judgment

Defendants' supplemental motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56 and implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp.2d 431, 436–37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 261 (4th Cir. 1998).[9] Here, plaintiff received adequate notice (ECF No. 48) and has responded appropriately. Consequently, the court finds it appropriate to address defendants' motion as one

court receive complaints and legal memoranda from self-represented prisoners as well-developed and supported as the materials provided here. While case law does not support the result sought by plaintiff, this case does not fail as a result of plaintiff's inattentiveness or inability to delineate and argue the issues raised therein.

[9] In contrast, a court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Board Unit 200 v. Norfolk Southern Corporation*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Department of Public Safety & Correctional Services*, Civ. No. JFM–10–0206, 2010 WL 2732334, at *3 (D. Md. 2010).

for summary judgment.

Summary Judgment is governed by Fed.R.Civ.P. 56(a), which provides, in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

In resolving the motion, the court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). However, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Moreover, the court must abide by the " 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.' " *Bouchat*, 346 F.3d at 526 (quoting Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The court must also abide by the " 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial' " *Bouchat*, 346 F.3d at 526

(internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex* 477 U.S. at 323–24 (1986)).

## Background

There are varying Islamic dietary traditions among Muslims, some more strict in their observance than others. According to the Islamic Food and Nutrition Council of America (IFANCA) and Islamic Services of America (ISA), a "halal," or "lawful" diet, prohibits items deemed "haram" (or "unlawful"), including pork and its by-products, animals improperly slaughtered or killed, alcohol and intoxicants, blood and blood by-products, and foods contaminated with haram products.[10] Gelatin, enzymes, and emulsifiers are questionable because of their unclear origins; they may be halal or haram.[11] Organizations such as IFANCA and ISA offer a certification procedure by which halal products are marked with a logo that confirms their halal status.[12]

Adherents of other faiths may also choose to adhere to diets based on scripture or dictates of conscience. As is the case among Muslims, some individuals are strictly observant of religious dietary requirements, while others within the same faith find such observance less compelling. Within the Jewish faith, the kosher diet is a way of eating that ascribes to Jewish dietary practices that were first put forth in the Torah, with rules derived from religious, philosophical, hygienic, ritualistic and/or practical reasons. The degree by which Jews follow a kosher diet varies: some individuals "keep kosher" daily, while others simply avoid pork and certain seafood and eat a wholly kosher diet only when certain Jewish holidays demand kosher

---

[10] *See* Islamic Food and Nutrition Council of America, *What is Halal?*, http:// www. ifanca. org/ halal/ (last visited August 21, 2012); Islamic Services of America (ISA), *What is Halal?*, http:// www. isaiowa. org/ content. asp? ID= 1677 (last visited August 21, 2012); *see also Williams v. Morton*, 343 F.2d 212, 215 (3rd Cir. 2009).

[11] *See* IFANCA, *What is Halal?; ISA, What is Halal?*

[12] *See* IFANCA, *About IFANCA*, http:// www. ifanca. org/ about/ (last visited August 21, 2012; ISA, *The Certification Process*, http:// www. isaiowa. org/ content. asp? ID =1680 (last visited August 21, 2012).

eating.[13]

America's exercise of freedom and tolerance has produced a kaleidoscope of religious practices. The nation's religious diversity is apparent even in the restrictive prison environment. Indeed, Maryland recognizes and provides religious accommodation for fifteen "mainstream" religions -- from Buddhist and Roman Catholic to Neo-pagan and Rastafari -- as well as dozens of denominational sub-groups and "other" faiths practiced by Maryland's approximately 24,000 incarcerated individuals.[14]   Approximately 5,600 Maryland prisoners, spread throughout DOC facilities, have declared themselves adherents of the Muslim faith.[15]

While prisoners have a constitutional right to receive a nutritious diet in keeping with their religious beliefs, *see Ross v. Blackledge*, 477 F.2d 616, 618-19 (4th Cir. 1973), the right is not absolute.[16]   Prison officials must craft such diets in order to eliminate perceptions of favoritism which could pose legitimate security concerns.[17]   The DOC's lacto-ovo dietary plan was developed in part in response to concerns of favoritism raised in a counseled civil rights

---

[13] *See* http://www.dietsinreview.com/diets/kosher-diet/  An individual "keeping kosher" may eat certain parts of any animal that has cloven hooves, chews its cud, and is slaughtered in accordance with Jewish law. Meat cannot be eaten with dairy products. Pork as well as shellfish are forbidden, but tuna, carp, salmon and herring are permitted. Utensils, including pots and pans and cooking surfaces that have come into contact with meat may not be used to cook or serve dairy products, and vice versa, and utensils that have come into contact with non-kosher food may not be used with kosher food, if the contact occurred while the food was hot. *See http://www.jewfaq.org/kashrut.htm*.

[14] *See* ECF No. 47, DOC Religious Preference Registration (Appendix 1 to DCM 140-001, attached to Declaration of Stephanie Coates, Director of Religious Services. DOC Religious Services Program Policy and Procedures. Former Director of Religious Services Nancy Williams indicates in her Declaration, ¶ 9, that in March of 2004, 5,724 individuals, or 24% of the prison population, identified themselves as Muslims, and 225 prisoners, or 1% of the population, registered as Jewish. Williams states generally her knowledge (unsupported by documentation) that roughly 150 Jewish prisoners currently receive a kosher diet plan. This number is also reflected in Declaration of Richard West, the current Director of Correctional Food Service for DPSCS, ECF No. 53, ¶ 12.

[15] *See* ECF No. 47, OBSCIS I information sheet attached to Coates Declaration.

[16] The question of religious dietary practices in the prison context is not new to this Circuit. *See Abernathy v. Cunningham*, 393 F.2d 775, 778 (4th Cir. 1968) (officials need not provide a special religious diet if the inmate can maintain an adequate diet by choosing items from the available menu).

[17] *See Rendelman v. Rouse, et al.*, Civil Action No. JFM-07-580 (ECF No. 22 at 4), aff'd on other grounds, 569 F.3d 182 *4th Cir. 2009); *see also* Williams Affidavit, ECF No. 47, Exhibit B, ¶ 12.

action filed on behalf of members of the Moorish Science Temple of America, a uniquely American religious group identifying itself as part of Islam.[18]  Plaintiffs in *Calhoun-el*, in part, demanded meat slaughtered in the Islamic tradition, which some Islamic scholars consider an obligatory requirement of faith.  The Moorish prisoners argued they were discriminated against because they had one religiously acceptable diet choice (the lacto-ovo diet) while Christians had two (a regular diet or the lacto-ovo diet).  The Honorable Frank A. Kaufman entered summary judgment in favor of the DOC defendants, finding no discrimination[19] and recognized that the cost of providing meat from ritually slaughtered animals was a compelling state interest.[20] During the litigation the five DOC Muslim chaplains were consulted and affirmed that the lacto-ovo diet provided was halal.[21]

Nancy Williams, Director of Religious Services from March of 1981 until her retirement in May of 2009, notes in her declaration that during her tenure two menus were offered to all prisoners; a lacto-ovo vegetarian diet (which provided dairy products but no meat or fish) and the regular diet plan, containing meat but no pork or pork products.

Williams states these options were designed to remove meat (pork) offensive to both

---

[18] *See Calhoun-el v. Robinson, et al.*,  Civil Action No. K-89-547 (D. Md.) (consolidated with *Salaam, et al. v. Collins, et al.*, Civil Action No. K-76-1676 (D. Md.) and *Robinson-bey v. Robinson, et al.*, Civil Action No. K-89-548 (D. Md.).  It is unclear whether plaintiff, an adherent of this sect of Islam who has been incarcerated since 1990, participated in this lawsuit.

[19] Judge Kaufman also found that for a period of time prior to October 1, 1992, the DOC provided a nutritionally adequate, pork-free diet to all prisoners, and also provided kosher meals to Jewish prisoners.  Because the Muslim prisoners claimed providing Jewish prisoners such meals while denying them ritually slaughtered meat violated equal protection, the DOC amended its practices to provide all prisoners with the choice of a pork-free diet containing meat, chicken and fish, and a lacto-ovo-vegetarian diet.  Judge Kaufman denied equitable relief and money damages based on this claim, finding that the nature of the litigation changed during the pendency of the case, with the Muslim prisoners amending their claim to include the denial of equal protection based on the fact that Christians could choose two menu options (meat or lacto-ovo), while observant Muslims were limited to the lacto-ovo diet.  At that time, there were two Orthodox Jews, housed at the same facility as plaintiffs, who were provided a kosher diet.  *See* July 12, 1993 Memorandum Opinion at 3, 18, attached hereto.

[20] *See* July 12, 1993 Memorandum Opinion at 18-19.

[21] ECF No. 47, Williams Declaration, ¶ 7.

Muslim and Jewish prisoners and indicates that prior to implementation of the lacto-ovo diet, the standard substitutes for pork and pork products were cheese, eggs or peanut butter. ECF No. 47, Williams Declaration, ¶ 3. Williams' rationale behind development of the lacto-ovo diet is contradicted by the Declaration of Richard West, who asserts that the lacto-ovo diet was **not** adopted for both Jewish and Muslim prisoners. West indicates that the "primary purpose behind the development of the lacto-ovo diet was to provide an acceptable menu that would meet the dietary needs of the Islamic Community" while also meeting "the dietary requirements of several other faith groups such as the Seventh Day Adventists, Buddhists, Rastafarians and others." ECF No. 53, ¶ 9.

Presumably, West meant that the lacto-ovo diet was not intended to meet the needs of Orthodox Jewish prisoners who "keep kosher." The genesis and evolution of the diet plans are further obscured by counsel's statement that "confusion over meals provided to Jewish and Muslim inmates appears to be one of semantics, not substance" because "the Kosher diet is the same as the Halal-satisfying vegetarian or lacto-ovo diet. Unfortunately, Islam was omitted from [the] DCD 160.0002 list." ECF No. 22, n. 1. The undersigned finds the two diets are **not** identical, because the kosher diet occasionally provides tuna, which is considered "parve"[22] under Jewish law.[23] ECF No. 53, West Declaration, ¶ 8. Furthermore, kosher law mandates that utensils that have come into contact with non-kosher food may not be used with kosher food – a dietary prerequisite not required in the Muslim diet and not observed by DOC dietary staff responsible for preparing "regular" and "lacto-ovo/vegetarian" meals.

The DOC has established religious holy days for each recognized religious group, and

---

[22] "Parve" foods are made without animal or dairy products or their derivatives, and thus may be eaten with either meat or dairy dishes. See http://www.oed.com/view/Entry/239732?redirectedFrom=parve#eid.

[23] Plaintiff does not contend – and the court does not find – that the occasional provision of tuna, which is also available from the prison commissary, violates equal protection.

each group was permitted one special meal to celebrate a significant holy day.[24]   On September 29, 2008, Jewish prisoners at Eastern Correctional Institution ("ECI") (where plaintiff was then housed) were provided a religious meal using an outside vendor paid by the DOC.[25]   Shortly thereafter, in February of 2009, the Governor ordered DPSCS to develop a kosher diet to meet the dietary laws of the Jewish community.[26]   The result culminated in a Religious Diet Program Directive (EcD.DOC.160.0002, dated April 7, 2009) which meets the religious dietary needs of kosher Jews as well as those of the House of Yahweh, Assembly of Yahweh and the Hebrew Israelites, a total population of approximately 150 prisoners.[27]   According to Richard West, the lacto-ovo diet is not included in this directive because, although it satisfies halal requirements, it was never specifically designed as a religious diet, and is available to all prisoners.

Development of this religious diet appears to have sparked the instant litigation. Plaintiff, then housed at ECI, requested that he be provided a diet in conformity with his

---

[24] ECF No. 22, West Declaration, ¶ 6.  Jewish prisoners received a frozen, pre-plated and packaged kosher-certified meal on the first day of the nine-day Passover observance, and the DOC provided kosher grape juice, challah bread, matzoh, honey and an apple.  ECF No. 22, Attachment 2.  Muslim prisoners received breakfast and evening meals during Ramadan, and were provided each day with raisins or dried fruit to "break the fast."  They were permitted to eat on the last evening chow line in order that they may consume their meal during the religiously prescribed hours. ECF No. 47, Williams Declaration, ¶ 5.  West claims that as with all religious groups authorized a special meal, Jewish and Muslim prisoners could also choose to purchase the meal from a selection of several vendors, depending on what they wanted to spend.  *Id.*, ¶ 6; *see also* COMAR 12.02.10.01, referenced on pp 8-0 of the ALJ decision. Plaintiff claims Muslims and other religious groups no longer are permitted to purchase these special religious meals.  ECF No. 52 at 5.  This claim has not proceeded through the Administrative Remedy Procedure ("ARP") process, and specific facts are not presented in plaintiff's supplemental opposition memorandum.  To the extent plaintiff seeks to litigate this claim, he may file the appropriate action after completion of administrative remedies. It shall not, however, be addressed here.

[25] ECF No. 22, West Declaration, ¶ 7 and Attachment 3 thereto.  No reason for the special purchase is apparent, nor is it apparent whether such purchase was a rare or one-time event.  It appears the holiday observed was Rosh Hashana. *See http://judaism.about.com/od/holidays/a/08_cal.htm.*

[26] Although unclear, it appears the kosher diet was developed because until then there were no provisions to accommodate Jewish prisoners' unique dietary and food preparation needs.

[27] ECF No. 53, West Declaration, ¶¶ 9, 13.

religious practices.[28] On April 21, 2009, defendants Shaff and Heffron allegedly informed plaintiff the diet was reserved for Jewish prisoners and he was to eat from the regular menu or the vegetarian (lacto-ovo) menu. Plaintiff promptly filed a grievance which culminated in the December 10, 2010 administrative determination that he be provided halal meals. *See Turner-bey v. The Maryland Division of Correction*, OAH No. DPSC-IGO-002V-09-37236.[29] The instant action was commenced while the administrative matter was pending, and was received by the Clerk on October 8, 2010.

## Plaintiff's Evidence

Plaintiff argues that Muslims should be permitted to request a religious diet, an option currently available only to Jewish prisoners.[30] ECF No. 1 at 3. He also requests the inclusion of halal-certified meats in the context of a diet that otherwise is halal in the sense of simply not being haram (forbidden).[31] Plaintiff points out that defendants' expert, Hajj Habib Ghanim, Sr.,

---

[28] This was not the first time plaintiff requested accommodation for a religious diet. *See* March 15, 2007 response from Nancy Williams concerning ritually slaughtered meat for Muslims. ECF No. 26, Exhibit K (filed separately).

[29] ECF No. 26, Exhibit O (filed separately). The proposed decision and order of the administrative law judge was affirmed by DPSCS Secretary Maynard on January 3, 2011. *Id.* As the finding has little impact on the issues raised herein, it is not relied upon in this Memorandum.

[30] The DOC's Religious Diet Program, set out in emD.DOC.160.0002 (attached as Exhibit A to ECF No. 26) supports the claim that the diet is available only to Jewish prisoners who request it. As written, the Directive applies only in DOC facilities equipped to accommodate the religious diet program and applies only to those who are Jewish or members of the House of Yahweh, the Assemblies of Yahweh, or the Hebrew Israelites. Counsel for defendants indicates the Directive as written contains a misstatement, because the diet provided Jewish prisoners is the same as the vegetarian or lacto-ovo diet provided to Muslims. As noted supra, counsel's statement is incorrect: the religious diet is based on kosher law and sometimes provides fish as a menu item. Fish is not available to those eating a lacto-ovo diet. Counsel notes that "[u]nfortunately, Islam was omitted from [the] DCD 160.0002 list." This statement directly contradicts Richard West's affidavit stating the diet was specifically developed for Jewish prisoners requiring a kosher diet. *See* ECF No. 53, West Declaration, ¶ 12. Counsel is invited to clarify the contradiction and to indicate whether any omission or error in the Directive has been corrected.

[31] This inference is based on plaintiff's "amendment" to his opposition motion (ECF No. 54 and attachments thereto), wherein plaintiff complains that he is served ice cream and other snacks that may contain gelatin derived from pork. Whether such foods may be eaten is questionable ("mashbooh") under Islamic law. While defendants appear to provide prisoners notice that certain dessert items may contain gelatin or other haram products, defendants do not substitute other dessert items for those who express a religious objection to eating these products, because caloric requirements of a healthy diet otherwise are met. ECF No. 54 at 7, 11-13, including June 4, 2012 Memorandum from Todd Hull, Correctional Dietary Manager. The court finds no constitutional deprivation based

of the Islamic Society of the Washington Area ("ISWA"), states that while there

> are no prohibitions regarding the preparation and serving of vegetarian
> meals for the Muslim faith…it must be noted that almost all Muslim
> meals usually have meat, poultry and fish for protein, but those meats/
> poultry must be halal slaughtered….Fish may be served alone.

ECF No. 22, Exhibit F at 1.

Plaintiff further contends that Jewish prisoners receive food accommodations, including ritually slaughtered meat, to celebrate one holy day, an opportunity denied the Muslim community.   Plaintiff provides copies of ingredients listed on the kosher-certified boxed meals provided at ECI to an unspecified number of Jewish prisoners on September 28, 2008 to celebrate Rosh Hashanah, to support his argument. The "Ribeye Roast" clearly was crafted with water and carrageenan product and is vegetarian; the makeup of the "Roast Chicken Breast" and "Roast Turkey" meals is unclear; and the "Beef Goulash" clearly contains beef.   ECF No. 26, Exhibit J.   Plaintiff provides a copy of a portion of the Religious Diet Menu (for April, 2009 into 2010), which notes items such as "sloppy joe," "beef," "sausage," "chicken," "tacos," and "Southern BBQ."   *Id.,* Exhibit L.

Plaintiff also provides a list of halal foods certified by Syed Rasheeduddin Ahmed on behalf of the Muslim Consumer Group for Food Products, and notes that foods prepared with alcohol (such as those containing brewer's yeast or artificial flavors such as vanilla extract) or gelatins (which may contain pork or substances from animals not slaughtered in the halal tradition) cannot be certified as halal. *Id.,* Exhibit E and Affidavit at ¶¶ 23-35. He implies that because the vegetables, milk and egg products provided him under the lacto-ovo diet are not certified halal, he may in fact be consuming meals prepared using forbidden by-products.   *Id.* Plaintiff especially worries that cheese products may contain brewer's yeast, yogurt, sour cream

---

on this practice.

and cottage cheese may contain rennet, and juice may have been filtered using gelatins. *Id.* He further complains that both regular diet (meat-containing) and lacto-ovo meals are prepared in the same kitchen area using the same utensils.[32]  ECF No. 26 at 5; Affidavit, ¶ 58.

### Defendants' Evidence

Defendants contend that all diet choices available to accommodate religious practices – including those provided Muslims, Jews, Hindus, Buddhists, Seventh Day Adventists, Assembly of Yahweh, House of Yahweh and Hebrew Israelites -- are built on the vegetarian/lacto-ovo platform available to all.  ECF No. 22, Affidavit of Richard West, ¶¶ 4, 7.  West, who for nearly twenty years has held the position of Director of Correctional Food Services for the DOC, further avers that "meats" provided in the kosher diet are simply vegetable products made from soy or vegetable proteins.  ECF No. 53, West Affidavit, ¶ 5 and Global Food attachments thereto.

Stephanie Coates, Director of Religious Services for the DOC, avers that there are approximately 5,600 adherents of the Muslim faith currently housed throughout the DOC's facilities.  ECF No. 47, Coates Declaration, ¶ 5.  Coates avers that Muslims are provided one celebratory meal each year,[33] usually done for the observance of the holiday of Eid-ul-Fi'tr.[34] Additionally, they partake in group Jum'ah worship every Friday, and the holiday of Eid-ul-

---

[32] Plaintiff alleges that the designated kosher kitchen areas, ovens and utensils are not kept truly separate and are contaminated by the presence of rodents (ECF No. 26, Affidavit, ¶¶ 45-51, 58).  The court notes that the Muslim Consumer Group does not indicate that Muslims require separate food preparation areas.  Thus, these allegations need not be addressed, as these deficiencies, if true, do not affect plaintiff.

[33] Plaintiff claims Jewish prisoners are permitted to purchase celebratory meals from approved outside vendors, while Muslims and others are not.  ECF No. 52, Memorandum at referencing DIC 140-001 § c (3) D and F.  This issue was not part of the initial complaint, and there is no indication that plaintiff has exhausted administrative remedies concerning this claim.  Should plaintiff present this claim after completing administrative review, the court shall examine the issue.

[34] Eid al-Fi'tr is a celebration "breaking the fast" following the month of Ramadan.  *See* http://islam.about.com/od/ramadan/f/eid_fitr.htm.

Adha[35] is observed.  During the month of Ramadan, Muslims receive daily religious services and are permitted early morning meals and to fast during daylight hours.  They are also permitted to attend late meals or are provided "fasting bags" to consume in their cells after dark.  *Id.*, ¶ 8. Defendants aver that the lacto-ovo diet as prepared in DOC prisons is sufficiently halal.  ECF No. 53, West Declaration, ¶ 9; ECF No. 22, Halal Certification Islamic  Society of the Washington Area, May 16, 2011, attached to West Declaration.

Defendants demonstrate that they have consulted with Islamic religious and dietary leaders to ensure that the lacto-ovo diet is sufficiently halal.  In 1995, defendant West and the DOC's Director of Religious Services met with five Muslim DOC chaplains to develop a nutritionally balanced menu meeting the dietary requirements of the Islamic faith.  ECF No. 47, West Declaration, ¶ 9.   West again consulted the authoritative body overseeing halal food certifications in April of 2011, to ensure that the DOC's halal diets continued to meet requirements.  ECF No. 47, West Delaration, ¶5.  More recently, West invited Islamic authorities on halal to visit the DOC's Maryland Correctional Institution for Women ("MCI-W") and any other prison facility of their choosing to examine the menu and food preparation area to ensure compliance with Islamic dietary practices.  The visiting authorities found MCI-W satisfactory and declined the opportunity to visit other facilities.  *Id.*, ¶ 15.

Defendants also provide a declaration from Dr. Brannan Wheeler, Director of the Center for Middle East and Islamic Studies and a history professor at the United States Naval Academy. According to Dr. Wheeler, Muslim jurists "carefully distinguish between the 'Sunnah' of the prophet Muhammad as the behaviors he established during his lifetime to be emulated by his followers, and the legal category of 'sunnah' (i.e., customary but non-mandatory) practices that

---

[35] Eid-ul-Adha is a festival of sacrifice that typically falls in November.  *See* http://islam.about.com/od/hajj/a/adha.htm.

might be derived from the Quran, Sunnah, or other sources." ECF No. 47, Wheeler Declaration, ¶ 6(a). Dr. Brannan states that: certain forbidden substances may be used for medicinal purposes (i.e., pork-derived insulin is legal for diabetics), *id.*, ¶ 9; the practice of vegetarianism is permitted and even seen as exemplary, *id.*, ¶ 10; and certain practices of Islam are not required or allowed for certain social groups such as prisoners, *id.*, ¶ 11(b). Dr. Brannan provides a detailed analaysis of Muslim dietary practices and notes that dietary rules "are not supposed to be overly restrictive or burdensome upon Muslims"...but instead "stipulates a relatively small number of general rules which, according to Muslim jurists, are not to be followed in all of their specific details to their final logical conclusions. This approach to maintaining a Muslim diet is also the general attitude of the vast majority of practicing Muslims today." Thus, foods containing small quantities of pork or pork-by-products, cheese, butter fat, sour cream, when, glycerins, and lecithin are permitted, because "Islamic law does not prescribe this attention to detail...[and] specifically provides allowances for the consumption of foods technically not allowed...Muslim jurists do not ecpect Muslims to examine in minute detail all of the ingredients and the source of the ingredients included in their food and drink." *Id.* at 17-19.

Defendants acknowledge a recognized religious diet has been designed for the small segment of Jewish prisoners who "keep kosher," but note that with the exception of occasional offerings of certain types of fish, the foods provided within the kosher diet are essentially the same provided in the lacto-ovo diet offered plaintiff. Defendants state that Jewish prisoners are not provided meat from ritually-slaughtered animals, and further contend that providing any meat-based religious diets for any group would be cost-prohibitive and involve food preparation techniques that cannot be met in most DOC facilities. They also argue that religious feasts are

equally accommodated and neither Jews nor Muslims receive religiously slaughtered meat in conjunction with those feasts.[36]

## Analysis

Preliminarily, the court notes that defendants Heffron, Shaff, and Khattak (respectively, a dietary regional manager, dietary manager at ECI, and Islamic Chaplain at ECI) lack the authority to order or implement changes to the DOC's religious or therapeutic diet guidelines affecting the kosher and vegetarian/lacto-ovo diets. ECF No. 22, Declarations of Shaff, Heffron and Khattak, attached thereto. There is no evidence that these defendants are responsible for the allegedly unconstitutional food policies at issue here, nor any indication that they acted in any manner other than within the boundaries of their limited authority. Granting of summary judgment in their favor is therefore appropriate. Furthermore, plaintiff provides no factual basis to hold defendant Green, ECI's warden, liable. At most, plaintiff appears to name Green in the caption solely on the basis of the doctrines of vicarious liability and/or respondeat superior, [37] which generally are not applicable in § 1983 actions. *See Vinnedge v. Gibbs*, 550 F.2d 926, 927–99 (4th Cir. 1977); *see also Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 691 (1978). Thus, Green is entitled to dismissal from this action.

Prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). They retain the protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion."[38]   Nonetheless, "lawful incarceration brings about the necessary

---

[36] Defendants do not indicate whether Jewish prisoners are able to purchase holiday meals containing meat from outside vendors.

[37] Respondeat superior is a legal doctrine whereby an employer may be held responsible for its employees.

[38] *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam).

withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). A prison regulation impinging on constitutional rights is valid if it is reasonably related to legitimate penological interests.[39] *See Turner v. Safley*, 482 U.S. 78, 89 (1987).

A.    RLUIPA

Prior to 1994, claims that regulations violated a prisoner's right to freely exercise his or her religion were evaluated under the "reasonableness" standard set forth in *Turner* and *O'Lone*. In 1993, however, Congress passed the Religious Freedom Restoration Act ("RFRA"), which stated that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. *See* 42 U.S.C. § 2000bb-1(b) (1994). The United States Supreme Court subsequently declared the RFRA unconstitutional in that Congress had exceeded its powers under Section 5 of the Fourteenth Amendment. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). In response, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in 2000, resurrecting the compelling state interest as follows: "No government shall impose a substantial burden on the religious exercise of a person residing or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that

---

[39] Indeed, the role of the federal judiciary is not to micro-manage state prisons or to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995).

person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. *See* 42 U.S.C. § 2000cc-1(a).[40]

RLUIPA does not give prisoners an unfettered right to religious accommodation. Rather, the statute mandates "due deference to the experience and expertise of prison and jail administrators." *Lovelace v. Lee*, 472 F.3d 174, 210 (4th Cir. 2006), quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). Plaintiff bears the burden of persuasion on whether the policy or practice substantially burdens his exercise of religion. *See* 42 U.S.C. § 2000cc-2(b). If plaintiff satisfies this requirement, the government must then prove that the challenged policy is the least restrictive means of furthering a compelling governmental interest. *Id.* § 2000cc-1(a); *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009); *see also Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012). "As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the government." *Smith*, 578 F.3d at 250.

RLUIPA defines the term "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-(7)(A). Plaintiff contends the Qu'ran permits Muslims to eat many types of meat or poultry, but that the animals eaten must be appropriately slaughtered. ECF No. 52 at 7. It may be that the eating of ritually slaughtered meat is not a qualifying religious exercise under RLUIPA.[41] Presuming, however, that that eating ritually slaughtered meat is a qualifying

---

[40] The language of RFRA and RLUIPA is nearly identical; thus, cases evaluated under the RFRA are still persuasive regarding the standards for a "substantial burden" as well as the "least restrictive means of furthering a compelling state interest."

[41] *But see Couch*, 679 F.3d 197, 203 (Muslim's desire to maintain 1/8 inch beard was qualifying religious exercise); *Smith*, 578 F.3d at 249, 251 (Rastafarian's desire to grow hair was qualifying religious exercise); *Warsoldier v. Woodford*, 418 F.3d 989, 991, 996 (9th Cir. 2005) (Native American's desire to grow hair was qualifying religious exercise).

religious exercise, the DOC's failure to provide such meat does not establish a substantial burden on plaintiff's exercise of his religion.[42]  Here, plaintiff is not asked to choose between violating a religious precept or depriving himself of adequate nutrition; an alternative meat-free diet is available that is acceptable under Islamic law.[43]  ECF No. 22, Halal Certification from the Islamic Society of the Washington Area, May 16, 2011.

> B.    Free Exercise Clause

Plaintiff also claims defendants' failure to provide him a "religious diet" violates the Free Exercise Clause, applicable to the states by virtue of the Fourteenth Amendment. *see Employment Division v. Smith*, 494 U.S. 872, 876-77 (1990), which provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amend. 1.  A prisoner, however, does not enjoy the full range of freedoms as those not incarcerated; rather, state action violates a prisoner's constitutional rights if it burdens a prisoner's religious rights and is not reasonably related to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89 (1987); *accord O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).  Here, the denial of ritually slaughtered meat to both Jewish and Muslim prisoners is directly related to prison security (to prevent tension caused by the perception that different groups are treated differently), and is also related to cost, both with regard to the purchase of religiously slaughtered meat and to the cost of retrofitting food preparation and storage facilities and providing additional staff to keep such foods separate.

---

[42] RLUIPA does not define the term "substantial burden"; however, the courts have determined that a substantial burden is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.  *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (internal citation and quotation marks omitted).

[43] *See also* ECF No. 47, Declaration and Expert Report of Dr. Brannan Wheeler.  The diet outline is attached to ECF No. 22.

The kosher diet (provided Jewish prisoners) is labeled "religious" and the lacto-ovo diet (provided those with health problems and vegetarians as well as prisoners of various faiths, including Islam) is labeled "medical." As noted, the distinction is one of semantics: the facts show that the diets were designed to provide religious accommodation within the parameters dictated by prison management necessities. See ECF No. 22, Lacto-ovo vegetarian diet, Medical Diet Manual Appendix 2. Kosher requirements, including special meal preparation and the eating of specific foods, must be followed for certain segments of the Jewish prison population, while halal requirements can be met using the lacto-ovo diet, provided that fasting during daylight hours and additional foods such as fruit be permitted during the month of Ramadan. Nothing more is constitutionally required.

Plaintiff must show that his claims are rooted in religious belief and not in "purely secular" concerns. See *Wisconsin v. Yoder*, 406 U.S. 205, 215, 216 (1972). It is well settled that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. Ind. Empl. Sec. Div.* 450 U.S. 707, 714 (1981). However, beliefs which are philosophical and personal, rather than religious, do not rise to the demand of the religion clause. See *Yoder*, 406 U.S. at 205. As noted above, plaintiff offers no evidence that eating ritually slaughtered meat is a tenet of his religion and not a purely secular concern arising out of (1) his mistaken belief that Jewish prisoners are afforded ritually-slaughtered meat denied to Muslims, and (2) his contention that the religious diet developed for Jewish prisoners who keep kosher diets demonstrates favoritism toward that group. He has failed to show that his free exercise rights are substantially burdened.[44]

---

[44] Had he made the requisite showing of a substantial burden, then the DOC would be required under RLUIPA to show that its restrictions on plaintiff's free exercise right to eat ritually-slaughtered meat are the least restrictive means to further a compelling interest. A "substantial burden" must be more than just an inconvenience, but must be an interference "with a tenet or belief that is central to religious doctrine." *See Stefanow v. McFadden*, 103 F.3d

C.    Establishment Clause

Plaintiff also alleges that the DOC supports Jewish prisoners who "keep kosher" in violation of the Establishment Clause of the First Amendment, because these prisoners are provided a "religious diet" governed by special regulations, while others are not.  In essence, the question presented is whether the dietary accommodation provided Jewish prisoners (which satisfies the requirements under RLUIPA) is consistent with the Establishment Clause.  The interplay between RLUIPA and the Establishment Clause in the prison context was examined in *Cutter v. Wilkinson*, 844 U.S. 709 (2005).[45]  Noting that "the government may...accommodate religious practices...without violating the Establishment Clause," *id.* at 713, citing *Hobbie v. Unemployment Appeals Comm' of Florida*, 480 U.S. 136, 144-45 (1987). the Supreme Court held that RLUPIA's requirement that prison officials increase the level of protection of prisoners' religious rights did not violate the Establishment Clause, provided a privileged status is not imposed on any particular religious sect or a particular sect is not singled out for disadvantageous treatment. *Id.* at 722-724.  The Court further noted that those officials retained

---

1466, 1471 (9th Cir. 1996) (RFRA case). In other words, the DOC's action must pressure the inmate to commit an act forbidden by his religion or prevent him from engaging in conduct mandated by his faith. For example, a substantial burden would be imposed if prison officials forced Muslims or Jews to eat pork, or denied Catholics the ability to pray the rosary.

[45] The plaintiffs were three Ohio prisoners who belonged to non-mainstream religious groups. They filed suit against various Ohio corrections officials, alleging initially that the officials had violated their rights under the Free Exercise Clause of the First Amendment by refusing to accommodate their religious beliefs by, among other things, denying them access to literature and ritual items and failing to provide a chaplain trained in their religions. The prison officials moved to dismiss the inmates' RLUIPA claims, insisting that the statute was unconstitutional on its face and as applied. Pursuant to 28 U.S.C. § 2403(a), the United States intervened to defend the constitutionality of the statute. All three cases were consolidated before the district court, which adopted the Report and Recommendation of the magistrate judge denying the motions to dismiss and upholding the validity of RLUIPA. The United States Court of Appeals for the Sixth Circuit reversed. *see Cutter I*, 349 F.,2d at 260. Reaching only the officials' First Amendment challenge, the Sixth Circuit held that RLUIPA violated the Establishment Clause because it had "the impermissible effect of advancing religion" by favoring religious rights over other fundamental rights. *Id.* at 265-268.  The prisoners sought and obtained review by the Supreme Court. After consideration, the Court reversed and remanded, holding that the statute did not, "on its face, exceed the limits of permissible government accommodation of religious practices." *Cutter*, 544 U.S. at 714.  The Supreme Court unanimously rejected a challenge under the Establishment Clause, reasoning that RLUIPA is merely an effort to "accommodate" religious freedom in the difficult context of prison life At the same time, the Court refused to pass on the prison officials' other constitutional challenges.

the ability to impose a substantial burden on the exercise of those rights in furtherance of a compelling governmental interest in maintaining order and safety. *Id.* at 722-723.

First, the purpose behind development of the religious diet is to provide a food source for Maryland's 150 Jewish prisoners who regularly "keep kosher." The purpose of the diet is not to promote religion; rather, it is to provide a basic diet to a small segment of the prison population that absent such accommodation would be forced to violate the very tenets of its faith.[46] Providing religious accommodations to the inmates within its custody while at the same time operating within constraints of economic and security concerns is a permissible purpose under the Establishment Clause. *See Cutter,* 544 U.S. at 722-23; *Grayson v. Schuler,* 666 F.3d 450, 455 (7th Cir. 2012); *Muhammad v. City of New York Dept. of Corrections,* 904 F.Supp. 161, 198 (S.D.N.Y. 1995).

Similarly, allowing one religious feast for each religious group is permissible, especially where, as here, additional expenditures by the DOC for provision of ritually slaughtered meat is denied as to all. The court finds that the DOC's actions neither advance nor inhibit religion, and avoid excessive entanglement with religion. Because no genuine issues of material fact remain with regard to this claim, the DOC's motion for summary judgment will be granted on this claim.

D.     Equal Protection

Plaintiff's final argument is that defendants' accommodation of Jewish prisoners through adoption of a religious diet while refusing to provide a religious diet for Muslim practitioners violates his rights under the Equal Protection Clause of the Fourteenth Amendment. "The Equal Protection Clause generally requires the government to treat similarly situated people alike."

---

[46] As noted above, kosher dietary law, unlike Islamic dietary law, requires strict separation of various foods eaten in a particular meal as well as strict separation of kosher and non-kosher foods in preparation and storage areas and plates, pots, pans and utensils.

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  To show that his equal protection rights were violated plaintiff must demonstrate that he was treated differently than similarly situated inmates and the discrimination was intentional or purposeful.  *See Williams v. Bitner*, 307 Fed. Appx. 609, 611 (3rd Cir. 2009).  If the discrimination was based on plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, plaintiff must show that the discrimination did not bear a rational relationship to a legitimate government purpose.  *See Cleburne*, 473 U.S. at 440-42.

The key to an equal protection claim here requires a showing "that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1027, 1051 (8th Cir. 1998). Accordingly, "while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner's claims under the equal protection clause ... must still be analyzed in light of the special security and management concerns in the prison system."[47]  *Morrison v. Garraghty*, 239 F. 3d 648, 655 (4th Cir. 2001), citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.")  The "differences" in treatment between Jewish and Muslim prisoners arises not out of defendants' intentional discriminatory acts: rather, kosher Jewish diet demands certain food preparation and food choices not required for Muslims who seek a halal diet.  Neither group receives ritually slaughtered meat; both diets are centered around a lacto-ovo vegetarian diet.

---

[47] A prisoner's rights under the Constitution must not be inconsistent with his or her status as a prisoner. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest. *See Thornburgh v. Abbott*, 490 U.S. 401, 409-10 (1989).

While the two diets are not the same, the needs of both religious groups are accommodated.[48] The kosher diet is outlined as a "religious diet" in DOC regulations; the lacto-ovo diet is outlined in the DOC's regulations as a "medical diet." While this fact may have created some impetus for this lawsuit, the names applied to the two diets is but a difference without distinction. No discriminatory animus is shown, and this claim fails as a matter of law.

For reasons noted above, there is no showing that defendants discriminated against plaintiff because of his religion. Summary judgment shall be entered in favor of defendants on all claims raised in the complaint. An order shall be separately filed in accordance with this Memorandum.

9/18/12
(Date)

J. Frederick Motz
United States District Judge

---

[48] Whether both groups are able to purchase special religious meals containing meat for their once-a-year celebration remains a question that cannot be resolved here but may be addressed in the future.